CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED
JAN 19 2022
JULIA C. DUDLEY, CLERK
BY: s/ H. MCDONALD
      DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | |
|---|---|
| MEGAN M.,[1] | ) |
|     Plaintiff, | )  Civil Action No. 4:20-cv-00048 |
| | ) |
| v. | )  REPORT & RECOMMENDATION |
| | ) |
| KILOLO KIJAKAZI, | )  By:    Joel C. Hoppe |
| Acting Commissioner of Social Security, | )       United States Magistrate Judge |
|     Defendant.[2] | ) |

Plaintiff Megan M. asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' filings, and the applicable law, I cannot find that the Commissioner's decision is supported by substantial evidence. Accordingly, I respectfully recommend that the decision be reversed and the case remanded under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Acting Commissioner Kijakazi is hereby substituted as the named defendant in this action. 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 404.1505(a).[3] Social Security ALJs follow a five-step process to determine whether a

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

2

claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Megan applied for DIB in February 2017, alleging disability due to Hodgkin's lymphoma, asthma, chronic obstructive pulmonary disease ("COPD"), bipolar disorder, depression, anxiety, insomnia, ovarian cysts, migraines, and premenstrual dysphoric disorder ("PMDD"). *See* Administrative Record ("R.") 144–45, 163, ECF No. 13. Disability Determination Services ("DDS") denied her application initially in June 2017, R. 66–79, and upon reconsideration in January 2018, R. 80–94. In March 2019, Megan appeared with counsel and testified at an administrative hearing before ALJ Monica L. Flynn. R. 37–53. A vocational expert ("VE") also testified at this hearing. R. 53–57.

ALJ Flynn issued an unfavorable decision on May 20, 2019. *See* R. 15–23. She first found that Megan had not worked since her alleged onset date of November 6, 2016, and that she met the Act's insured-status requirements through June 30, 2018.[4] R. 17. Megan's "residuals from Hodgkin's lymphoma, obesity, and asthma" were "severe" medical impairments during this

---

[4] The latter date is called the date last insured, or "DLI." *See Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 341 (4th Cir. 2012). "To qualify for DIB, [Megan] must prove that she became disabled prior to the expiration of her insured status." *Johnson*, 434 F.3d at 655–56.

relevant period, *id.*, but they did not meet or equal any Listed impairment, R. 18–19 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 3.02, 3.03, 13.05).

ALJ Flynn then evaluated Megan's residual functional capacity ("RFC") and found that she could perform "light work,"[5] but that she could "only occasionally climb, balance, stoop, kneel, crouch or crawl," could tolerate "frequent" exposure to humidity, and could tolerate "occasional" exposure to pulmonary irritants, hazards, and unprotected heights. R. 19. Based on this RFC finding and the VE's testimony, ALJ Flynn concluded at step four that Megan was able to perform her past relevant work as a sales clerk and food sales clerk. R. 21 (citing R. 54–55). Alternatively, Megan could have performed other occupations existing in the national economy (e.g., final inspector, sorter/inspector, document preparer) during the relevant time. R. 21–22. The Appeals Council denied Megan's request for review, R. 1–3, thereby making ALJ Flynn's written decision "the final decision of the Commissioner" denying her DIB claim, R. 1. This appeal followed.

III. Discussion

On appeal, Megan primarily argues that ALJ Flynn failed to provide a narrative discussion describing how she determined that Megan could perform "light work" during the relevant period and that she failed to explain why she discounted Megan's allegations that pain and numbness secondary to meralgia paresthetica significantly limited her abilities to sit, stand, and walk. *See generally* Pl.'s Br. 8–16, ECF No. 19. These arguments are persuasive and remand is warranted.

---

[5] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). A person who can meet these relatively modest lifting requirements can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983).

4

A.     *Summary*

   1.     *Relevant Medical Evidence*[6]

Megan began experiencing fevers, shortness of breath, fatigue, and night sweats in late October 2016. R. 329, 261. In December 2016, after undergoing X-rays and a CT scan of the chest, she was diagnosed with Hodgkin's lymphoma. R. 329. Megan had surgery to remove a tumor from between her lungs. R. 258, 735. Throughout 2016, Megan also often had coughs, chest discomfort, and fatigue relating to her COPD, asthma, and bronchitis. R. 258, 280–320, 307–09, 312–18, 388, 544, 548. Additionally, Megan was obese throughout the relevant period. R. 314, 325, 544, 685.

Megan's lymphoma and treatment caused residual issues, including meralgia paresthetica. *See, e.g.*, R. 597, 600–02, 709–14, 724, 767. Her meralgia paresthetica caused hip pain and numbness that emerged while undergoing chemotherapy. R. 709, 732, 735, 765. Megan first reported these symptoms to Neil Schacht, M.D., her treating physician, on April 3, 2017, complaining of a "pins and needles feeling in her right outer thigh, which she notice[d] more if she is active and then sits down." R. 735. The feeling could "last a few minutes or [a] couple of hours;" it "happen[ed] daily" and "occasionally w[oke] her at night." *Id.* On exam, she displayed "5/5 motor strength in [her] arms and legs bilaterally" and no spinal point tenderness. R. 736. Dr. Schacht explained that "myalgia and bone pain" were common side effects of chemotherapy, instructed Megan to continue Tylenol or try oxycodone, and encouraged her to exercise more and lose weight. *See id.* On April 17, Megan reported "intermittent numbness on the right outer side of her thigh," but she walked independently, and her exam findings were unchanged. R. 715.

---

[6] Megan alleged several impairments. R. 163. On appeal she only raises challenges to the sufficiency of the ALJ's consideration of her meralgia paresthetica, a residual of Hodgkin's lymphoma. *See generally* Pl.'s Br. 3–16. Thus, I discuss the medical evidence that is relevant to those conditions.

5

She continued experiencing issues with numbness in her right thigh throughout May and was diagnosed with meralgia paresthetica on May 22, 2017. *See* R. 557.

In June, Megan "continue[d] to have a pins and needles and numb feeling, but it [was] not burning any longer and it [did] feel improved to her." R. 726. Exam findings remained unchanged. R. 727. She reported numbness in her thigh in July 2017, and in August she expressed that her right thigh pain "has [an] occasional sharp stabbing pain that will last a minute or 2 and if she does not take oxycodone the pain will come back in a couple of hours." R. 723. She was taking four to six oxycodone per day for her pain, but she could walk without difficulty and again showed "5/5 motor strength in [her] arms and legs bilaterally" on examination. R. 723–24. At a follow-up visit with Dr. Schacht in early September, Megan reported "leg pain but otherwise she was not really feeling poorly." R. 597. By late September, however, she complained that without pain medication, it "feels like her 'bone is regenerating from the inside out.'" R. 625. She still walked independently, and her exam findings remained constant. R. 626. In November, Dr. Schacht recommended that Megan lose weight and avoid constricting clothing, prescribed oxycodone, and arranged for Megan to follow up with Danville Neurology, hoping that providers there would "recommend peripheral neuropathic therapy" other than Gabapentin. R. 557 (noting that Megan had a "difficult time with" Gabapentin).

In December 2017, Megan followed up with Danville Neurology as ordered and saw Victor Owusu-Yaw, M.D. R. 646–48. Dr. Owusu-Yaw's report notes that Megan had been diagnosed with meralgia paresthetica "but did not have any formal tests." R. 646. She complained of "right thigh numbness, tingling, and pain which she describe[d] as a 6/10 up to . . . a 10 at times [and] worse when she is standing." *Id.* Her neurological examination revealed that her "[s]ensation [was] abnormal throughout for modalities of touch, pinprick, vibration, and

6

temperature in the feet and increased sens[i]tivity and pain in the right thigh." R. 647. She was given a sample of Lyrica "to try until her follow up visit where she w[ould] undergo [a] nerve conduction test [on] the lower extremities." *Id.* When Megan saw Dr. Owusu-Yaw again in January 2018, "her symptoms ha[d] progressively gotten worse and [were] painful to vibration and palpation of the right thigh," but her neurological exam now demonstrated "normal [sensation] throughout for modalities of touch, pinprick, vibration, and temperature." R. 644. Dr. Owusu-Yaw noted that Megan should return "in 2 months, as needed and if signs or symptoms worsen or persist." R. 645.

In February 2018, Megan reported experiencing "numbness, tingling, burning, [and] stabbing pain" in her right thigh. R. 778. An examination revealed normal signs, with no leg edema or no pedal edema and normal gait. R. 779. Kelly Smith, N.P., assessed Megan's meralgia paresthetica as "chronic, not controlled;" ordered Megan to continue her weight loss efforts, avoid constricting clothing, and follow up with neurology, noting that she was "[o]n Lyrica with some improvement." R. 781. However, in April 2018, during an appointment with Fallon Mattis, M.D., for her bipolar disorder, Megan's meralgia paresthetica was assessed as "chronic, controlled." R. 692. This assessment appeared consistently throughout 2018. *See* R. 651, 675, 762–68, 769–74, 814–18.

In December 2018, Megan saw Gregory Weiss, M.D., seeking help with mood swings. R. 814. On neurological exam, Megan displayed no numbing or paresthesia. R. 816. Meralgia paresthetica continued to be included in Megan's medical history after December 2018, but she was not specifically treated or evaluated for this condition thereafter. *See* R. 806–12.

2. *Medical Opinions*

7

In May 2017, DDS medical expert Jack Hutcheson, M.D., opined that Megan could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday. R. 74–75. Explaining these findings, he noted Megan's diagnosis of Hodgkin's lymphoma, chemotherapy, asthma, and bronchitis. R. 75. He also found that the lymphoma and the side effects of chemotherapy limited Megan to occasionally climbing ramps, stairs, ladders, ropes, and scaffolds, and occasionally balancing, stooping, kneeling, crouching, and crawling. *Id.* (noting that these limitations were secondary to Megan's diagnosis of "Hodgkin's lymphoma and undergoing chemo"). Lastly, Dr. Hutcheson determined that chemotherapy and asthma required Megan to avoid "concentrated" exposure to humidity and "even moderate exposure" to pulmonary irritants and workplace hazards. R. 76.

In January 2018, DDS medical expert Bert Spetzler, M.D., opined that Megan could lift and/or carry twenty pounds occasionally and ten pounds frequently, stand and/or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. R. 89. These limitations were attributed to Megan's Hodgkin's lymphoma, chemotherapy, and COPD. R. 90. Megan could "frequently" kneel, crouch, or crawl, and "occasionally" stoop and climb ramps, stairs, ladders, ropes, and scaffolds. *Id.* These limitations likewise were based on her lymphoma, chemotherapy, and COPD. *Id.* Because of her COPD, Megan needed to avoid "concentrated" exposure to humidity and "even moderate exposure" to pulmonary irritants and workplace hazards. R. 91.

    3.    *Megan's Statements*

In April 2017, Megan submitted a Function Report to DDS. *See* R. 174–80. She described her typical day as consisting of getting her daughter ready, preparing frozen meals for

8

herself and her daughter, tending to her daughter throughout the day, and watching television with her daughter before bathing and putting her to bed. R. 181. At times, Megan required her family's help performing these tasks. *Id.* Her "grandmother and aunt [had] been keeping [her] daughter a lot" when Megan did chemotherapy, and her father also watched Megan's daughter when she was exhausted. R. 180. She had difficulty sleeping and was limited in her ability to care for herself. *Id.* She could drive, and she shopped about once every two weeks, but she could not cook like she used to and felt "exhausted and weak, depressed, [and] anxious." R. 177. Her conditions impacted her memory and her ability to squat, stand, walk, climb stairs, complete tasks, concentrate, and get along with others. R. 176. She could walk only about two aisles in the grocery store before needing to take a five-to-ten-minute break, and she could stand for only ten minutes before experiencing exhaustion and back pain. R. 174.

In October 2017, Megan submitted a second Function Report to DDS. *See* R. 193–200. At that time, her typical morning consisted of waking up, taking her medications, and watching TV while waiting for them to take effect. R. 193. She would take walks up and down the block and do light yoga about once or twice a week. *Id.* During the afternoon, Megan would take a long nap and eat a late dinner before going to bed. *Id.* She continued to care for her daughter, but her aunt and grandmother "help[ed] with basic childcare" and helped when she was too fatigued. R. 194. She still had trouble tending to personal care, would often spend the entire day in her pajamas, and required at least one nap each day. *Id.* She could prepare one meal each day for five minutes and could fold laundry for thirty minutes, but she had to take several breaks when washing dishes and could not do yard work because of "leg pain and nerve pain in the thigh." R. 195. She shopped for groceries about once a week and socialized with her daughter and with friends online. R. 196–97. "[S]evere nerve pain and joint pain in [her] legs prevent[ed] [her]

9

from standing, sitting, or walking very long without experiencing severe pain for several days," and she could not walk more than about two blocks before needing a five-to-ten-minute rest. R. 198.

On March 5, 2019, Megan testified at an administrative hearing before ALJ Flynn. *See* R. 37–53. She reported that she had finished about nine months of chemotherapy, but was still suffering from its side effects, including nerve damage and a painful "pins and needles" feeling in her right thigh and both feet. R. 38. Megan said that her doctors told her that "some of the side effects would go away within a year," but the nerve damage "might just stay" forever. *Id.*; *see also* R. 39 ("Q. So it's sort of wait-and-see in terms of what the nerves are going to do? A. Yes."). Megan could walk "about three blocks" before her right thigh and feet started "getting pins and needles and really hurting" from a damaged nerve that was rubbing around her hip bone. R. 38–39. She was unable to remain outside long without her inhaler because of her asthma. R. 40. She exercised with five-pound dumbbells, but she could only do it for a few minutes. R. 41. She lived with her four-year-old daughter in a home owned by her father, who temporarily allowed her to live there rent free, and her aunt and father provided her financial assistance. R. 42. She showered about once a week only when she had somewhere she needed to go, and she helped her daughter get ready for school, but usually needed to lie down when doing so. R. 47. In the evenings, she would play "dolls and cars" with her daughter for about an hour before bathing her and reading her a bedtime story. R. 49 (testifying that she would sit or lie down on the sofa while her daughter played on the floor). Her daughter was able to get in and out of the bath and dress herself. *Id.* Megan went grocery shopping "once every couple of weeks" and made "quick and easy" frozen meals. *Id.*

B.     The ALJ's Decision

In determining Megan's RFC, ALJ Flynn summarized her testimony and treatment history, as well as the medical opinion evidence of record. R. 19–20. She concluded that Megan had the RFC to perform "light" work "except that [she] can only occasionally climb, balance, stoop, kneel, crouch, or crawl, can only frequently be exposed to humidity, and can only occasionally be exposed to pulmonary irritants, hazards, and unprotected heights." R. 19.

In crafting this RFC finding, ALJ Flynn noted that Megan complained of shortness of breath, fatigue, and joint pain stemming from Hodgkin's lymphoma, but observed that her condition had improved with treatment and that Megan had "indicated that she is the sole provider for her three-year-old child, and stated that she and her daughter live alone, with her family providing financial assistance but not assistance with household tasks." *Id.* She determined that Megan's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that her "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained" elsewhere in the decision. R. 19. Regarding Megan's residuals from Hodgkin's lymphoma, ALJ Flynn found that, "[t]he medical evidence of record reflects that the claimant suffered nerve damage in her right leg due to chemotherapy treatments, but there is little indication in the record that she continues to experience significant fatigue and reduced functioning from her Hodgkin's lymphoma or treatment" and that "by the claimant's own testimony, she is the sole caregiver for her three-year-old daughter, and her family provides her with financial assistance, but not with assistance in providing for herself or her daughter." R. 20.

ALJ Flynn then considered the opinions of the DDS experts, giving "great weight" to Dr. Hutcheson's opinion from May 2017, and "significant, but not great, weight" to Dr. Spetzler's

11

less-restrictive opinion from January 2018. R. 20–21. She assessed Dr. Hutcheson's findings as follows:

> generally consistent with the record evidence, which establishes that the claimant has significant reduced functioning stemming from her Hodgkin's lymphoma treatment, including nerve damage to her right leg, and that her bodyweight and history of asthma cause additional limitations relating to her capacity to perform postural maneuvers and to tolerate certain work conditions, particularly in combination with the residuals of her cancer treatment.

R. 20. ALJ Flynn determined that Dr. Spetzler's findings were "generally consistent with the medical evidence of record, but [did] not sufficiently account for the effects of [Megan's] impairments in combination on her postural abilities and her abilities to tolerate workplace conditions." R. 21. ALJ Flynn concluded, based on the VE's testimony, that Megan was able to perform her past relevant work, R. 23, and that there were other jobs existing in significant numbers in the national economy that Megan could perform. R. 21. She thus concluded that Megan was not disabled during the relevant period. *Id.*

C.     *Analysis*

Megan's arguments challenge ALJ Flynn's RFC assessment, particularly taking issue with her alleged failures to provide a narrative discussion of the evidence relied on to determine Megan's RFC and to explain why she discounted Megan's subjective allegations of pain secondary to meralgia paresthetica. Pl.'s Br. 8–17. A claimant's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his medical impairments and symptoms.[7] SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–

---

[7] "Symptoms" are the claimant's own description of his or her medical impairment. 20 C.F.R. § 404.928(a).

12

31 (4th Cir. 2011), and it should reflect specific, credibly established "restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities," SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015); *Reece v. Colvin*, 7:14cv428, 2016 WL 658999, at *6–7 (W.D. Va. Jan. 25, 2016), *adopted by* 2016 WL 649889 (W.D. Va. Feb. 17, 2016). The ALJ has broad (but not unbounded) discretion to decide whether an alleged limitation is supported by or consistent with other relevant evidence, including objective evidence of the underlying medical impairment, in the claimant's record. *See Perry v. Colvin*, No. 2:15cv1145, 2016 WL 1183155, at *5 (S.D. W. Va. Mar. 28, 2016) (citing *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). Generally, a reviewing court will affirm the ALJ's RFC findings when it is clear that she considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and she built an "accurate and logical bridge from that evidence to h[er] conclusion[s]," *Woods v. Berryhill*, 888 F.3d 686 694 (4th Cir. 2018) (quotation marks and brackets omitted). *See Thomas v. Berryhill*, 916 F.3d 307, 311–12 (4th Cir. 2019); *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 662 (4th Cir. 2017); *accord Mascio*, 780 F.3d at 636 ("[T]he [RFC] 'assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" (quoting SSR 96-8p, 1996 WL 374184, at *7)).

Megan argues that ALJ Flynn's RFC analysis falls short of these standards because it does not "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily

13

activities, observations." Pl.'s Br. 9 (quoting *Mascio*, 780 F.3d at 636 (quoting SSR 96-8p)). Here, ALJ Flynn's analysis indeed falls short of this standard and precludes meaningful review.

In determining Megan's RFC, ALJ Flynn began by summarizing Megan's subjective statements regarding her symptoms. R. 19. Next, after determining that Megan's medically determinable impairments could reasonably be expected to cause her alleged symptoms, she briefly summarized the evidence relating to Megan's Hodgkin's lymphoma residuals and obesity. R. 20. Regarding Megan's Hodgkin's lymphoma residuals, ALJ Flynn noted Megan's history of Hodgkin's lymphoma, her surgery and chemotherapy, and her complaints of fatigue, and joint and nerve pain. *Id.* Nevertheless, she found that "there is little indication in the record that she continues to experience significant fatigue and reduced functioning from her Hodgkin's lymphoma or treatment." *Id.* The ALJ's discussion of Megan's treatment notes was only three sentences. *See* R. 20. Then, after erroneously asserting that Megan had testified that she "is the sole caregiver for her three-year daughter" and does not receive non-financial "assistance in providing for herself or her daughter," ALJ Flynn concluded that Megan's "residuals from Hodgkin's lymphoma primarily cause her exertional and postural limitations, and contribute to her environmental limitations." *Id.*

This conclusory discussion of the medical evidence leaves the Court "to guess about how the ALJ arrived at [her] conclusion on [Megan's] ability to perform relevant functions." *Mascio*, 780 F.3d at 637. Indeed, the only medical evidence that ALJ Flynn cited as support for her RFC determination is a parenthetical citation to exhibits within the record showing "generally normal signs during review of systems" that indicated Megan did not have continued reduced functioning from her residuals from Hodgkin's lymphoma. *Id.* While such findings offer some support the ALJ's determination, many of the pertinent findings and complaints within the

14

record, particularly about Megan's leg pain and related limitations, are absent from the discussion. *See, e.g.*, R. 647 (noting "increased sensitivity and pain in the right thigh" on sensory examination); R. 778–80 (noting "rt thigh numbness, tingling, burning, stabbing pain" in review of systems and classifying Megan's meralgia paresthetica as "chronic, not controlled"). Moreover, the ALJ's assessment that "there [was] little indication in the record that [Megan] continue[d] to experience significant fatigue and reduced functioning from her Hodgkin's lymphoma or treatment" is not necessarily reflective of her condition during the relevant period, from November 6, 2016 until June 30, 2018. R. 15, 20; *see* R. 23 (concluding that Megan was not disabled "at any time from November 6, 2016, the alleged onset date, through June 30, 2018, the date last insured"). ALJ Flynn was required to consider the evidence of record and explain how that evidence supports her conclusion as to Megan's RFC *throughout* the relevant period. *Cf. Shiplett v. Colvin,* No. 5:15cv55, 2016 WL 6783270, at *13 (W.D. Va. Nov. 16, 2016) ("To qualify for disability benefits, a claimant need not show that . . . she is permanently or even currently disabled at the time of the hearing. The ALJ must evaluate whether a claimant has shown that . . . she was disabled for any consecutive twelve-month period between" her AOD and the date of the hearing). Here, merely noting that Megan had been diagnosed with Hodgkin's lymphoma; she complained of fatigue, joint pain, and nerve pain resulting from treatment; and the record did not suggest that she continued to have significant functional limitations, falls well short of permitting this Court to meaningfully review the conclusion that Megan retained the RFC to perform light work during the relevant period, considering the contrary evidence in the record. Furthermore, ALJ Flynn's RFC analysis lacks the required discussion of the "evidence that [s]he found credible, useful, and consistent." *Woods*, 888 F.3d at 694. Thus, she has not built

15

an "accurate and logical bridge from [the] evidence to h[er] conclusions," and the decision cannot withstand scrutiny. *Id.*

Megan also argues that ALJ Flynn erred by rejecting the severity of her symptoms based solely on objective medical evidence in violation of *Craig v. Chater*, 76 F.3d at 585. The regulations set out a two-step process for evaluating a claimant's alleged symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 404.1529. "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms," *Lewis*, 858 F.3d at 866, "in the amount and degree[] alleged by the claimant." *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Step One is a "threshold" inquiry, at which the "'intensity, persistence, or functionally limiting effects' of the claimant's asserted pain" are not considered. *Id.* Assuming the claimant clears the first step of the *Craig* analysis, the ALJ moves on to Step Two. There, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [her] ability," *Lewis*, 858 F.3d at 866, to work on a regular and continuing basis, *Mascio*, 780 F.3d at 637; *Hines*, 453 F.3d at 565; *see also* SSR 16-3p, 2016 WL 1119029, at *4 (Mar. 16, 2016). "The second determination requires the ALJ to assess the credibility of [subjective] statements about symptoms and their functional effects," *Lewis*, 858 F.3d at 866, after considering all the relevant evidence in the record, 20 C.F.R. § 404.1529(c). The ALJ must give specific reasons, supported by "references to the evidence," for the weight assigned to the claimant's statements. *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5 (July 2, 1996)). But because "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques," an ALJ "may 'not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the

16

objective medical evidence does not substantiate' them." *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020) (quoting SSR 16-3p, 2016 WL 1119029, at *4–5); *see* 20 C.F.R. § 404.1529(c)(2). A reviewing court will uphold the ALJ's credibility determination if her articulated rationale is legally adequate and supported by substantial evidence in the record. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (citing *Eldeco, Inc. v. NLRB*, 132 F.32 1007, 1011 (4th Cir. 1997)).

Here, ALJ Flynn satisfied step one by finding that Megan's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." R. 19. She erred at step two, however, because the reasons for her conclusion that Megan's impairments were not as severe as alleged are unsupported by the record. In questioning the severity of Megan's symptoms, the ALJ cited "generally normal signs during review of systems" and noted the record did not contain evidence of continuing fatigue or reduced functioning from chemotherapy treatment. R. 20. She also observed, "by [Megan's] own testimony, she is the sole caregiver for her three-year-old daughter, and her family provides her with financial assistance, but not with assistance in providing for herself or her daughter." *Id.*

As discussed above, the ALJ's discussion of the medical evidence was inadequate, and her analysis is not supported by the record. Furthermore, Megan's testimony reflects that she did require assistance in caring for both herself and her daughter. *See* R. 180, 194. In her April 2017 Function Report, Megan stated that she cares for her daughter by feeding, dressing, and bathing her, as well as taking her to doctor's appointments. R. 180. Nevertheless, Megan also said her "grandmother and aunt ha[d] been keeping [her] daughter a lot" while she underwent chemotherapy and that her "father also help[ed] to watch [her] daughter when [she was] exhausted." Additionally, in her second Function Report, Megan said that her "aunt and

17

grandmother . . . help with basic childcare and some housework" and care for her daughter when she is too fatigued. R. 194.

At the administrative hearing, Megan testified about her daily activities. She would wake up at 5:00 a.m., drink water, watch television, and stay quiet. R. 47. Her four-year-old daughter got up at 9:00 a.m. R. 48. Megan made a simple breakfast and helped her daughter dress, brush her teeth, and get ready for school. R. 48. A bus picked her daughter up for preschool. Megan spent the rest of the day watching television or doing light chores, such as straightening up. After twenty minutes of activity, her thigh or feet would hurt, and she would have to lie down for twenty to thirty minutes. R. 48–49. When her daughter came home from school, they would play, and Megan prepared a quick dinner, such as a frozen meal. R. 49. Her daughter would take a bath, and they would read a story before bedtime. When Megan plays with her daughter, Megan usually is sitting or lying down. The activities that Megan described, including taking care of her daughter, are at most modest in light of how she said she performed them, and they do not contradict her complaints of leg pain. Additionally, they do not show an ability to work an eight-hour workday. *See Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) ("The administrative law judge's casual equating of household work to work in the labor market cannot stand.").

The ALJ, however, did not factor into her RFC assessment the limited nature of Megan's activities. Moreover, as detailed above, the ALJ did not discuss the consistent evidence in the treatment record of Megan's leg pain. The ALJ's reliance on an inaccurate picture of Megan's activities and incomplete discussion of the medical evidence creates a significant gap in the ALJ's analysis of her symptoms and limitations. *See Arakas*, 983 F.3d at 95 ("[T]he ALJ must consider the entire case record and may 'not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical

18

evidence does not substantiate' them."). Accordingly, I cannot find that the ALJ's decision is supported by substantial evidence.

IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** Megan's Motion for Summary Judgment, ECF No. 18, **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 20, **REVERSE** the Commissioner's final decision, **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: January 19, 2022

*Joel C. Hoppe*
Joel C. Hoppe
United States Magistrate Judge